# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Judy Zacharias,

                Plaintiff,        Civ. No. 12-174 (RHK/FLN)

v.                                    **MEMORANDUM OPINION AND ORDER**

Guardsmark, LLC,

                Defendant.

James E. Blaney, Blaney & Ledin Ltd., Lake Elmo, Minnesota, for Plaintiff.

Timothy D. Kelly, Kyle A. Eidsness, Timothy D. Kelly, P.A., Minneapolis, Minnesota, for Defendant.

## INTRODUCTION

In this action, Plaintiff Judy Zacharias alleges that her former employer, Defendant Guardsmark, LLC ("Guardsmark"), engaged in age discrimination when it removed her from her position as a security guard and later terminated her employment. Guardsmark now moves for summary judgment. For the reasons that follow, the Court will deny its Motion.

## BACKGROUND

Viewed in the light most favorable to Zacharias, see Graves v. Ark. Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000), the record reveals the following facts.[1]

---

[1] The record in this case initially comprised only one deposition transcript and a handful of documents. (See Doc. Nos. 14, 17, 21.) The Court asked Guardsmark to supplement the record (see Doc. No. 23), and it then filed additional documents and affidavits (Doc. Nos. 25-30).

Zacharias was born in 1942. (Zacharias Dep. Ex. 2.)[2] In 1989, she began working as a security guard for a company called Securitas, which contracted to provide security services for a Coca-Cola bottling facility in Eagan, Minnesota. (Zacharias Dep. at 60; Zacharias Dep. Ex. 2.) Her job involved performing "rounds" – that is, walking or driving around the facility to ensure it was secure – and checking the trailers of trucks hauling loads of beverages and other products onto and off of the property. (Zacharias Dep. at 60-63.) She worked the night shift (also referred to as the "third shift"), from 10:00 p.m. to 6:00 a.m., which she preferred because she was "not a morning person" and "like[d] staying up at nighttime." (Id. at 48, 53, 60, 138-39; Doc. No. 30, Ex. B; Doc. No. 18, Ex. A.)

Guardsmark is a limited liability company headquartered in New York, New York. (See Zacharias Dep. Ex. 21.) It is "engaged in the business of providing uniformed security personnel to businesses and other organizations throughout the United States," including through its Minneapolis branch. (Id.) In 2004, Coca-Cola changed its security provider at the Eagan facility from Securitas to Guardsmark. As part of the transition, Zacharias trained new guards on the duties to be performed at the facility. (Zacharias Dep. at 61.) During that training, she was approached by a Guardsmark "field supervisor," Michael Rustad, who inquired about her intentions regarding employment. (Id.) When she stated that she would likely find a position at a different Securitas client, Rustad informed her that she could "work here at Coke if you want," but as a

---

[2] All of the cited exhibits from Zacharias's deposition are attached to the Declaration of Guardsmark's counsel, Kyle Eidsness (Doc. No. 14).

Guardsmark employee. (Id. at 61-62.) Zacharias then applied for a job with Guardsmark and was hired in May 2004. (Id. at 62; Zacharias Dep. Ex. 2.) At the time, she was 61 years old.

Over the ensuing years, Zacharias continued "[d]oing pretty much the same thing" for Guardsmark at the Coca-Cola facility as she had been doing for more than a decade for Securitas. (Zacharias Dep. at 60.) She received several pay raises and a promotion to the position of sergeant during that time. (Id. at 23-24; Doc. No. 18, Ex. C.) She also worked many hundreds of hours of overtime and had no difficulty performing her job duties. (Zacharias Dep. at 23, 27-28, 40, 98, 131-33; Doc. No. 18, Ex. C.)

In December 2008, Coca-Cola directed Guardsmark to reduce by half the security staff at the Eagan facility. (Zacharias Dep. Ex. 17.) Up to that time, each shift at the facility – 6:00 a.m. to 2:00 p.m. (the "first shift"), 2:00 p.m. to 10:00 p.m. (the "second shift"), and 10:00 p.m. to 6:00 a.m. (the "third shift") – was staffed by two Guardsmark employees. (Doc. No. 30, Ex. B; Zacharias Dep. at 107-08.) Keith Livingston, Guardsmark's "site supervisor" and the person to whom Zacharias reported, circulated a memorandum to the company's Coca-Cola guards, informing them:

> Effective January 3, 2009, our security staff at Coca Cola will be cut in half. Coke wants one guard on duty per shift. The officer will not patrol but will just monitor vehicle traffic at the [gate]. Some officers will remain at Coke and others will be moved to a new account when one becomes available. As of right now I don't know who will be staying but will have a better idea in a couple of weeks and I will keep everybody informed.

(Doc. No. 30, Ex. B; Livingston Decl. ¶¶ 1, 3.)

Shortly after this memorandum was circulated, Craig Hinz, Guardsmark's "field supervisor" and Livingston's boss, came to the facility. (Zacharias Dep. at 18.) Zacharias asked him which employees would be staying at Coca-Cola, and he responded that he did not know, but that a decision would probably be made by the first week of January 2009. (Id. at 18-19.) On January 2, 2009, Hinz informed Zacharias that she was being removed from the Coca-Cola account in favor of the other guard who worked the third shift with her, James Jenkins, who is approximately ten years younger. (Id. at 19.)

Zacharias was upset. She asked Hinz why Jenkins was chosen to remain at Coca-Cola instead of her, as she believed she was more qualified for the position than he was. (Id.)[3] Hinz responded that the decision had been made by Livingston. (Id.) Zacharias then asked Livingston why he had opted to keep Jenkins on the Cola-Cola account instead of her. (Id.) He responded that it had not been him, but rather Hinz and Alex Duncan (Hinz's boss) who had made the decision. (Id. at 19-21.) Zacharias then called Duncan and asked the same question, and Duncan responded that Jenkins was a "team player." (Id. at 39.) When she asked what he meant by that statement, he offered no explanation and told her to speak to Livingston. (Id.) As Hinz had directed Zacharias to Livingston, who had then directed her to Duncan, who had then directed her back to Livingston, Zacharias concluded that her superiors were "passing the buck" and not giving her a "straight answer" why she (and not Jenkins) was removed from the Coca-Cola position. (Id. at 20.)

---

[3] At the time, Jenkins had worked for Guardsmark for slightly over one year. (Zacharias Dep. at 132-33; Doc. No. 14, Ex. C.)

- 4 -

Nevertheless, Zacharias asked Hinz whether Guardsmark intended to find her another position, as indicated on the memorandum circulated by Livingston. (Id. at 21.) He responded that the company was "going to find everybody a job that is being laid off." (Id.) She then told him that while she preferred a third-shift position, she was willing to "take second shift" and would "do any kind of job" for the company. (Id. at 117.) But over the next several months, Guardsmark contacted Zacharias only twice, in each instance offering her a one-night, fill-in work opportunity, neither of which she was able to accept. (Id. at 37-38.)[4] She repeatedly called Hinz to inquire whether other work was available; he initially informed her that there were no openings and eventually stopped returning her calls altogether. (Id. at 28-29.) Zacharias later learned that the other four, younger employees also removed from the Coca-Cola account were placed by Guardsmark in other positions, either full-time or part-time. (Answer ¶ 12; Zacharias Dep. at 125-28.)

Guardsmark terminated Zacharias's employment on April 23, 2009. (Zacharias Dep. Ex. 19.) When doing so, Duncan filled out a Guardsmark form entitled "Change in Payroll Status," on which he checked a box labeled "no work available." (Id.) The form's instructions provide that when an employee has been terminated for one of the reasons listed with an asterisk – and "no work available" was one such reason – a "detailed explanation of circumstances of [the] termination must be provided." (Id.) The form contains no "detailed explanation," however, and in fact contains no explanation at

---

[4] In the first instance, Zacharias received a voice-mail message from Guardsmark, but by the time she returned the call the position had already been filled. In the second instance, she was unavailable to work the open shift.

all, other than a second box having been checked for "reduction in hours at operation."
The form also indicates that it was to be presented to and signed by the terminated
employee, who is given the opportunity to check off boxes indicating whether her
employment with Guardsmark was "satisfactory" or "unsatisfactory." Those boxes are
unchecked, and the form is not signed by Zacharias.[5]

The second page of the payroll-change form contains a box for a "manager's
evaluation," in which Hinz's signature appears. The first question in that box asks,
"Would you recommend re-employing this individual?" The "yes" box initially was
checked, but then was crossed out and the "no" box checked instead. (Id.) Below this
question were several categories in which the employee could be rated on a scale of 0 to
10, with the ratings falling into classifications of "superior," "good," "average," and
"unacceptable." The form indicates that these categories were to be rated only for
employees "recommended for re-employment," but it was nonetheless filled out for
Zacharias. (Id.) She was given an 8 – in the good/superior range – for "performance of
duties," "attendance," and "communication skills." She was initially given a 6 (good) for
"ability to work with others," but that was crossed out and replaced with a 3, the bottom
of the average range. In the final category, "appearance," she initially received a 5
(average), which was crossed out and replaced with a 2 (unacceptable). (Id.) At no point
during her employment was Zacharias advised that her appearance was unacceptable to
Guardsmark or that the company believed she had difficulty working with others, and
these alleged "problems" were not communicated to her at the time her employment was

---

[5] Zacharias testified in her deposition that she had not seen the form prior to this litigation.

terminated. (Zacharias Dep. at 123.) In fact, Zacharias never received *any* evaluations of her performance, oral or written, during her time at Guardsmark or at termination. (Id. at 116.)

Following her termination, but on a date undisclosed by the record, Zacharias filed a charge of age and sex discrimination with the Minnesota Department of Human Rights ("MDHR"). (See Zacharias Dep. Ex. 21.) After conducting an investigation, the MDHR concluded on June 15, 2011, that probable cause existed to believe Guardsmark had discriminated against her on account of her age, by selecting Jenkins to remain on the Coca-Cola account over her. (Doc. No. 38.)[6] It offered several reasons to support its conclusion. First, it noted that Zacharias's performance was "consistently above expectations" during her employment, but that Jenkins, a younger employee, "had several issues with his performance" and in fact was "terminated involuntarily by" Guardsmark after the events in question here. (Id.) Second, it noted that the company had failed to contact Zacharias after Jenkins's employment was terminated, "hiring another younger employee instead." (Id.) Third, it noted that Guardsmark had failed to reassign Zacharias to another position despite "re-assign[ing] all of its younger similarly situated Guards who were laid off [at] the same time as" her. (Id.) And fourth, it noted that

---

[6] The parties' Joint Rule 26(f) Report (Doc. No. 4) mentioned that the MDHR had found probable cause for discrimination, but neither Zacharias's discrimination charge nor the MDHR's findings were made part of the summary-judgment record. At oral argument, the Court inquired about the MDHR's findings, and the parties agreed to submit them to the Court to be considered when ruling on the instant Motion. Accordingly, the findings have been filed into the record (Doc. No. 38) as an Exhibit. See also Quigley v. Winter, 598 F.3d 938, 951 (8th Cir. 2010) ("[I]n an employment discrimination case, the decision whether to admit or exclude administrative findings, such as EEOC investigation matters, is properly left to the sound discretion of the trial court.") (citation omitted).

- 7 -

Guardsmark had initially indicated on the payroll-change form that Zacharias was a strong performer who was eligible to be rehired, but "*four months later*, crossed out such ratings and changed them to poor." (Id. (emphasis added).)

Following the MDHR's probable-cause finding, Zacharias commenced the instant action in the Hennepin County, Minnesota District Court, alleging that Guardsmark's conduct constituted age and gender discrimination in violation of the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.01 *et seq.* Invoking diversity jurisdiction, Guardsmark removed the action to this Court. During discovery, Zacharias abandoned her gender-discrimination claim, leaving only her age-discrimination claim for resolution. With discovery complete, Guardsmark now moves for summary judgment on that claim. The Motion has been fully briefed, and the Court heard oral argument on December 18, 2012. The Motion is now ripe for disposition.

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed. Id. at 322; Whisenhunt v. Sw. Bell Tel., 573 F.3d 565, 568 (8th Cir. 2009). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009); Carraher v. Target Corp., 503 F.3d 714, 716 (8th Cir. 2007). The nonmoving party may not rest on

mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue of material fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Wingate v. Gage Cnty. Sch. Dist., No. 34, 528 F.3d 1074, 1078-79 (8th Cir. 2008).

## ANALYSIS

### I. The MHRA generally, the *prima facie* case, and Aikens

The MHRA prohibits discrimination based on a number of protected categories, including age. See Minn. Stat. § 363A.08, subd. 2 (proscribing conduct by employers "because of race, color, creed, religion, national origin, sex, marital status, status with regard to public assistance, membership or activity in a local commission, disability, sexual orientation, or age"). MHRA age-discrimination claims are analyzed in the same fashion as claims arising under the federal age-discrimination statute, the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.* See, e.g., Chambers v. Metro. Prop. & Cas. Ins. Co., 351 F.3d 848, 855 (8th Cir. 2003); Anderson v. Hunter, Keith, Marshall & Co., 417 N.W.2d 619, 626-27 (Minn. 1988). Such claims may be proven with either direct or circumstantial evidence of discrimination. Id.

Where, as here, a plaintiff lacks direct evidence of age discrimination, she may establish her claim under the familiar McDonnell Douglas[7] burden-shifting framework. E.g., Carraher, 503 F.3d at 716-17. "Under this analytical framework, once the plaintiff employee establishes a prima facie case of discrimination, the burden shifts to the defendant employer to articulate a legitimate, nondiscriminatory reason for its actions. If

---
[7] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

the defendant offers such a reason, the burden shifts back to the plaintiff to put forth evidence showing the defendant's proffered explanation is a pretext for unlawful discrimination." Gilbert v. Des Moines Area Cmty. Coll., 495 F.3d 906, 914 (8th Cir. 2007) (citations omitted).

Here, the parties disagree about the elements of Zacharias's *prima facie* case. Their dispute centers on (1) whether Zacharias was removed from the Coca-Cola account as part of a reduction in force (RIF) and (2) the appropriate elements of the *prima facie* case when a RIF has occurred. (See Def. Mem. at 13-19; Mem. in Opp'n at 14-17.) The Court need not wade into this legal thicket, however, because Guardsmark has proffered a nondiscriminatory reason – actually, several reasons – for its actions.

As the Court previously noted, "the McDonnell Douglas test is 'no longer relevant' and 'drops out of the picture' once the defendant has proffered a legitimate, nondiscriminatory reason for its actions. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993). The question to be decided in that instance is 'discrimination *vel non*.' Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000) (quoting U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 714 (1983))." (Doc. No. 23 at 2.) Stated differently, when a defendant "has done everything that would be required of him if the plaintiff had properly made out a prima facie case, *whether the plaintiff really did so is no longer relevant*. The district court has before it all the evidence it needs to decide whether the defendant intentionally discriminated against the plaintiff." Aikens, 460 U.S. at 715 (emphasis added). Courts, therefore, routinely skip over the *prima facie* case where an employer has proffered a nondiscriminatory explanation for its conduct,

- 10 -

proceeding directly to the "ultimate question of discrimination *vel non*." Id.; accord, e.g., EEOC v. Trans States Airlines, Inc., 462 F.3d 987, 992 (8th Cir. 2006) ("Because the record was fully developed on motions for summary judgment, we may turn to the ultimate question of discrimination *vel non*."). The Court will do the same here.

## II.     A genuine issue of fact exists

Considering the totality of the evidence in the record, including the MDHR's probable-cause determination, and viewing that evidence in the light most favorable to Zacharias, the Court concludes that there exists a jury question whether Guardsmark discriminated against her due to her age. Several factors lead the Court to this conclusion.

*First*, there is some question whether Jenkins, who was younger than Zacharias but who was selected to remain on the Coca-Cola account, was less qualified for the position. Although the record contains little evidence regarding his work history before Guardsmark, it does indicate that he had worked for the company for only about a year prior to being chosen to retain the overnight job. Moreover, the record indicates that Jenkins "had several issues with his performance" during his employment and was fired after Zacharias was terminated. By contrast, Zacharias had worked for Guardsmark for a lengthy period of time, getting promoted to sergeant and receiving pay raises along the way, and she performed well while doing the same job for Securitas for more than a decade. "Pretext may be proven by evidence showing a younger, less-qualified, weaker-performing employee replaced an older employee." Loeb v. Best Buy Co., 537 F.3d 867, 875 (8th Cir. 2008); accord, e.g., Gilbert, 495 F.3d at 916 ("[A]n employer's selection of

a less qualified candidate can support a finding that the employer's [proffered] reason . . . was pretextual.").

*Second*, when Zacharias inquired why she was removed from the Coca-Cola account instead of Jenkins, her superiors pointed fingers at one another – Hinz blamed Livingston, who in turn blamed Hinz and Duncan, and Duncan in turn blamed Livingston.[8] A jury could reasonably determine that her supervisors' game of "hot potato" was an attempt to dissemble for discrimination. See, e.g., Tinker v. Sears, Roebuck & Co., 127 F.3d 519, 523 (6th Cir. 1997) (concluding that inconsistent statements by different managers as to "who was actually responsible for the decision to fire" the plaintiff raised a genuine issue regarding the employer's proffered reason for termination); Berube v. Great Atl. & Pac. Tea Co., No. 3:06-cv-197, 2010 WL 3021522, at *7 (D. Conn. July 29, 2010) (evidence of pretext where "no single individual at [the defendant company] takes responsibility for making the final decision to terminate [the plaintiff's] employment").

*Third*, Zacharias asserts that Duncan informed her she was chosen for removal because Jenkins was "a team player" – thereby intimating she was not. Despite repeated requests, however, she received no explanation what Duncan meant by that term, which is inherently subjective. See, e.g., Chambers, 351 F.3d at 858 (noting that subjective reasons deserve greater scrutiny, as they are "easily fabricated"). Moreover, Zacharias was promoted and received raises throughout her tenure with Guardsmark, undermining

---

[8] The Court notes there is no evidence in the record from Hinz or Duncan; the former died before this action was filed and the latter was terminated by Guardsmark in 2010 and cannot now be located. (Doc. No. 30, ¶¶ 2, 4.)

the suggestion that she was not a "team player." That suggestion also is undercut by the "manager's evaluation" portion of the payroll-status form signed by Hinz when Zacharias's employment was terminated. There, she was rated as good to superior for "performance of duties" and "communication skills," and at least average for her "ability to work with others" – a ranking that was changed *four months* after the fact from a rating of good.[9]

*Fourth*, Guardsmark's proffered reason for its conduct has changed over time. As just noted, the company initially denied the "team player" comment, and in its Answer to the Complaint in this case, it argued that Zacharias was removed from the Coca-Cola account because she "had often experienced difficulty with the repeated 'up-and-down' required to . . . perform a vehicle check during her shift because she had 'bad knees.'" (Answer ¶ 38.) In its initial Motion papers, however, the company made scant mention of her alleged knee problems, arguing instead that she was not, in fact, a "team player." (Def. Mem. at 21-22; accord Def. Reply at 13 ("Guardsmark told Zacharias she was not a team player when it decided to keep Jenkins on the night shift at Coke in January.").) Then, when the Court ordered the record supplemented, Guardsmark again changed

---

[9] Interestingly, when responding to Zacharias's discrimination charge with the MDHR, Guardsmark denied that the "team player" comment had been made. (Zacharias Dep. Ex. 21.) The company changed tacks here, arguing in its initial Motion papers that Zacharias was not a "team player" because she preferred only to work late shifts. (Def. Mem. at 25 ("'[T]eam players' are employees who can cover all shifts, not employees who rule out day shifts."); accord Def. Reply at 13.) Yet, this argument enjoys no *evidentiary* support – there is nothing in the record to indicate that Duncan (or anyone else at Guardsmark) believed a "team player" was someone able to work all three shifts at the Coca-Cola facility. Guardsmark also points out that Zacharias was once disciplined for complaining about a co-worker's (mis)conduct, and had complained to Livingston about Jenkins's performance. (Def. Mem. at 7-9.) But again, there is no evidence in the record indicating this is what Duncan had in mind when he (allegedly) made the "team player" comment.

- 13 -

course, returning to its original assertion that Zacharias was chosen for removal from the Coca-Cola account "because of her knee and leg problems." (Def. Supp. Mem. (Doc. No. 24) at 2; accord Livingston Decl. ¶¶ 5-6.) Moreover, the after-the-fact changes to the payroll-status form could be interpreted to mean the company's reasons have shifted over time. These "inconsistenc[ies] in the reasons advanced by [Guardsmark] [are] sufficient to create a genuine fact issue as to whether the reason[s] proffered by [it] [were] the true reason[s] for" its conduct. Young v. Warner-Jenkinson Co., 152 F.3d 1018, 1023 (8th Cir. 1998); accord, e.g., Allen v. Interior Constr. Servs., Ltd., 214 F.3d 978, 983 (8th Cir. 2000) ("[E]vidence that an employer proffered disparate reasons for adversely treating an employee may support an inference of discrimination."); Kobrin v. Univ. of Minn., 34 F.3d 698, 703 (8th Cir. 1994) ("Substantial changes over time in the employer's proffered reason for its employment decision support a finding of pretext.").

*Fifth*, assuming *arguendo* that Guardsmark is relying upon Zacharias's so-called "knee and leg problems" as the reason behind its conduct, there is evidence in the record calling into doubt the veracity of that explanation. Livingston avers in a Declaration that he "knew [Zacharias] had problems with her knees and legs *because she complained to me about her knees and legs a number of different times, and said she had even missed work because of them*." (Livingston Decl. ¶ 6 (emphasis added).) He similarly asserted that he "knew she had trouble doing [] vehicle checks." (Id.) But Zacharias adamantly denies ever having spoken to Livingston about knee and leg problems or having difficulty performing vehicle checks. (Zacharias Decl. ¶ 3 ("Mr. Livingston's statement is false. I did not complain to him about my knees and legs. I did not have trouble doing vehicle

checks.").)[10]  At summary judgment, the Court must resolve this dispute in Zacharias's favor.  And Livingston has offered no other explanation how he might have learned about these alleged issues with Zacharias's knees – indeed, she notes that she "rarely worked with" him.  (Zacharias Decl. ¶ 4.)  While Livingston need not have been *correct* in his assessment of Zacharias's medical issues, see, e.g., Bone v. G4S Youth Servs., LLC, 686 F.3d 948, 955 (8th Cir. 2012), he must have had a "good faith basis" for his beliefs, id., and the record (taken in Zacharias's favor) does not reveal one.  In other words, the evidence "create[s] an issue as to whether [Livingston] honestly believes in the reasons [he] offers."  Wohl v. Spectrum Mfg., Inc., 94 F.3d 353, 357 (7th Cir. 1996) (citation omitted).

Furthermore, Zacharias performed thousands of hours of overtime and was promoted during her tenure with the company, undermining the contention that she had difficulty performing aspects of her job.  Hinz's rating of her performance as good to superior on the payroll-status form also undermines that contention.  And, the evidence indicates this form was altered months after the fact, to change Zacharias from someone recommended for re-employment to someone not so recommended.  A jury may properly infer a discriminatory motive from those belated changes.  See, e.g., Fisher v. Vassar Coll., 66 F.3d 379, 396 (2d Cir. 1995) ("[D]ishonest acts such as the falsifying of

---

[10] Her deposition testimony is consistent.  (See Zacharias Dep. at 130-31 ("Q: [H]ad you, from time to time, had difficulty getting up, going out, walking around the trucks because of knee problems?  A:  No, I did not. . . .  Q:  You would say, look, my knee hurts or something like that, so the other guard would go outside and do the vehicle check?  A:  No.  Q:  Is that true?  A: No."); id. at 131-32 ("Q:  Did you hear anything to th[e] effect, look, Judy, one of the problems here is you've got difficulty doing the vehicle checks, the other guys have been doing it for you? Did you ever hear that?  A:  No.  Because I never told Keith that I had bad knees.").)

documents (or perjury) suggest that an employer is attempting to hide a discriminatory intent."); Stanphill v. Health Care Serv. Corp., No. CIV-06-985-BA, 2008 WL 2359730, at *6 n.21 (W.D. Okla. June 3, 2008) (noting that if the jury found a "material alteration of a medical record, it could infer that the facts stated in the altered document were pretextual"); Nese v. Nordic Constr. Servs., Inc., No. 02 C 5839, 2004 WL 1179387, at *5 (N.D. Ill. May 26, 2004) (alteration of documents indicated pretext).[11]

*Sixth*, and finally, each of the other individuals removed from the Coca-Cola account – all younger than Zacharias – was placed into another position with Guardsmark. To be sure, some of those positions were part-time rather than full-time, some were weekend-only jobs, and some were not on the third shift. But Zacharias testified in her deposition that although she informed Hinz she *preferred* a third-shift position, she was willing to "take second shift" and would "do any kind of job" for the company. (Zacharias Dep. at 117.) She has reiterated in her recently filed Declaration that she "never told anyone at Guardsmark that [she] should not work part-time, weekend, or second shift positions" (Zacharias Decl. ¶ 6) – precisely what was given to her younger co-workers, despite Guardsmark's repeated protestations that there was "no work available." And Guardsmark has in fact offered no evidence that similar positions were not available for Zacharias.

Admittedly, not all of the evidence in the record suggests that Guardsmark was engaged in age discrimination. It is undisputed that the company was instructed by Coca-

---

[11] Notably, the payroll-status form contains a box labeled "poor work performance" and another labeled "failure to meet company standards or requirements," but neither was checked.

Cola to reduce staffing at the Eagan facility, meaning that at least *some* employees (which ultimately included Zacharias) had to be removed from the account. Moreover, the fact that the company offered Zacharias one-night, fill-in positions on two separate occasions in early 2009 is not entirely consistent with the notion that it was discriminating against her. It is also noteworthy that Zacharias was hired by the company when she was 61 years old, and she received a promotion and several raises during her employment, undercutting the contention that Guardsmark was engaged in discrimination against older employees. And, Zacharias testified in her deposition that she did not witness discriminatory acts while employed and previously believed Guardsmark "is a good company to work for and they're fair." (Zacharias Dep. at 43, 110-11.)

But the question at this juncture is whether there is sufficient evidence in the record to create a genuine issue that Guardsmark discriminated against Zacharias on account of her age. Liberty Lobby, 477 U.S. at 249 ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.").[12] While the Court recognizes this case presents a close call, it concludes that Zacharias has done "more than simply show that there is some metaphysical doubt as to the material facts," but rather has proffered enough evidence to create a genuine issue whether Guardsmark discriminated against her. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). Summary judgment must therefore be denied.

---

[12] Guardsmark incorrectly argues that Zacharias must "*prove* pretext" at this stage. (Def. Reply at 15 (emphasis in original).) In actuality, she must create a *genuine issue* on pretext to survive summary judgment.

Finally, the Court pauses to address Guardsmark's argument that Zacharias should be precluded from obtaining damages in this case because she failed to seek other employment and, hence, failed to mitigate. (Def. Mem. at 23-25.) A successful age-discrimination plaintiff "must show that . . . she attempted to mitigate damages or face a reduction in the damage award." Denesha v. Farmers Ins. Exch., 161 F.3d 491, 502 (8th Cir. 1998). This requires her to "use reasonable diligence in finding suitable employment and not refuse a position substantially equivalent to the one at issue." Id. (citation omitted). As mitigation is an affirmative defense, Guardsmark bears the burden of showing that "there were suitable positions available and that [Zacharias] failed to use reasonable care in seeking them." Id.

Guardsmark correctly notes that Zacharias testified in her deposition that she did not apply for other positions after her employment with the company ended. (Zacharias Dep. at 48.) But she also testified that she believed she could not work for other security companies while still employed by Guardsmark, and the record reveals that she did not learn her employment had been terminated by the company until April 2009. Moreover, there is at least some evidence in the record – including a letter from the Minnesota Unemployment Insurance Department (Doc. No. 14, Ex. F) – showing that Zacharias *did* attempt to find another job after being removed from the Coca-Cola account. Accordingly, the Court cannot decide on this record, as a matter of law, that Zacharias's efforts were unreasonable and that she should be precluded from seeking damages as a result. This issue will have to await further development at trial.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Guardsmark's Amended Motion for Summary Judgment (Doc. No. 34) is **DENIED.**

Date:  January 10, 2013

s/Richard H. Kyle
RICHARD H. KYLE
United States District Judge